Jon V. Harper (#1378)
HARPER LAW, PLC
P.O. Box 581468
Salt Lake City, UT  84158
Tel: (801) 910-4357
Email: jharper@jonharperlaw.com

[Additional counsel on signature pages]
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| Anthony Parisotti, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br> v.<br><br>Overstock.com, Inc., Patrick M. Byrne and Gregory J. Iverson,<br><br>       Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>Jury Trial Demanded |

Plaintiff Anthony Parisotti ("Plaintiff"), by and through his attorneys, alleges upon personal knowledge as to himself, and upon information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, among other things, a review of documents filed by Defendants with the United States Securities and Exchange Commission (the "SEC"), news reports, press releases issued by Defendants, and other publicly available documents, as follows:

### NATURE AND SUMMARY OF THE ACTION

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Overstock.com. Inc., ("Overstock" or the "Company") common stock between May

9, 2019 and November 11, 2019, inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b), 20(a) and 20(A) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), 78t1 and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      Overstock was once a very profitable e-commerce website that sold household furniture and accessories, such as bed, bath, and kitchen products at discount prices. The Company's fortunes changed however, due to, among other things, a general decline in the retail market and increased competition.

3.      At the beginning of the Class Period, however, Overstock's fortunes appeared to turn, reporting its first profit since 2016 in its quarterly report for Q-1 2019, filed with the SEC on May 9, 2019. Not only was the Company EBITDA positive for the first time in recent years, but the Company also raised year-end guidance by 50%.

4.      This return to profitability occurred at a fortuitous time for the Company: it was just prior to the launch of Overstock's cryptocurrency project, tZERO, which had reportedly cost shareholders $100 million. Indeed, Defendants extolled the virtues of its new cryptocurrency segment and issued a series of press releases and public statements promoting the Company's transition to a crypto currency exchange service provider.

5.      Adding drama to the launch of tZERO, the Defendants announced a bizarre plan to offer Overstock investors their next dividend in the form of a cryptocurrency created by Overstock. The scheme called for investors to receive the crypto equivalent of one Series A-1 Preferred Stock for every 10 shares of Overstock common shares they own – but there were conditions involved. To receive their dividend,

each investor would have to deposit their shares in an alternative trading system called PRO Securities that is operated by tZero.

6.      In addition, the digital dividend was not registered under the Securities Act of 1933 or applicable state securities laws. Consequently, no secondary resales of the cryptocurrency could occur until they become eligible for resales under Rule 144 under the Securities Act – usually about six months from the record date.

7.      Investors were mostly confused or annoyed by receiving their dividend in this form and with these restrictions, but did not suspect the true motivations behind the digital dividend – to manipulate Overstock's share price by orchestrating a "short squeeze."  This was possible because a short seller is responsible for any dividends issued during the time when that seller has borrowed shares, the inability to obtain the locked-up digital token dividend made it impossible for short sellers to maintain their short positions. As the short sellers frantically tried to cover their positions, they bid up the price, creating a huge spike in Overstock's share price.

8.      Eventually, the scheme would be exposed by analysts and result in scrutiny from the SEC, resulting in the Company's share price crashing and resulting in huge investors losses. The Company's founder and former Chief Executive Officer, however, received a windfall. Having been tipped off to the SEC inquiry, he sold his entire holdings in Overstock during a three-day period immediately prior to the SEC inquiry becoming public for approximately $90 million. Adding insult to injury, he actually bragged about his insider trading on social media.

9.      On September 22, 2019, the final shoe dropped when the Company reported that its Chief Financial Officer had left Overstock in an unscheduled departure the prior week. The Company did not provide a reason for the departure, nor did it explain why it waited nearly a week to announce the change.

In addition, the Company reported that it would lower guidance to break-even EBITDA for the year, eliminating the projected $15 million that Overstock had only recently guided investors to expect. This announcement resulted in one of the largest stock drops in the Company's history and further punished investors who had believed the Defendants' misrepresentations regarding the digital dividend and the Company's business prospects.

10.     Defendants were motivated to and did conceal the true operational and financial condition of Overstock, and materially misrepresented and failed to disclose the conditions that were adversely affecting the Company throughout the Class Period, because it (i) enabled them to deceive the investing public regarding Overstock's business, operations, management and the intrinsic value of Overstock common stock; (ii) enabled defendants to artificially inflate the price of Overstock common stock; (iii) enabled defendant Byrne to sell over $90 million of his privately held Overstock shares while in possession of material adverse non-public information about the Company; and (iv) caused Plaintiff and other members of the Class to purchase Overstock common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually took the actions set forth herein.

## JURISDICTION AND VENUE

11.     The federal law claims asserted herein arise under §§ 10(b), 20(a) and 20(A) of the Exchange Act, 15 U.S.C. § 78j(b), 78t(a) 78t1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.    This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation with sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this District Court permissible under traditional notions of fair play and substantial justice.

14.    Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

15.    In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.    Plaintiff Anthony Parisotti is an individual residing in Tamarac, Florida who acquired and held shares of the Company at artificially inflated prices during the Class Period. His acquisition of these shares was made contemporaneously with inside-trading activity, as described herein. He has been damaged by the revelation of the Defendants' material misrepresentations and material omissions, and the impact of these revelations on his investment in Overstock.

17.    Defendant Overstock is a Delaware corporation with its principal place of business located in Midvale, Utah. The Company's common stock trades on the NASDAQ under the ticker symbol "OSTK." According to Overstock's' website, the Company is a tech-driven online retailer that has evolved from a "fledging startup to a billion-dollar online retailer as a result of a hard-working and creative team."

5

18.     Defendant Patrick M. Byrne ("Byrne") is an American entrepreneur and founder of Overstock. He was its Director and Chief Executive Officer ("CEO") until his abrupt resignation on August 22, 2019. Byrne purportedly resigned because he was "far too controversial" after claiming that he had been involved in the "deep state" investigation of the 2016 presidential election. During the class period, Byrne made materially false and misleading statements regarding Overstock's business operations and prospects, which he knew or should have known were materially false and misleading when made. Also during the class period, Byrne sold more than $90 million of his Overstock share while in possession of non-public, materially adverse information regarding the Company.

19.     Defendant Gregory J. Iverson ("Iverson") was the Chief Financial Officer ("CFO") of Overstock until his resignation on September 17, 2019. No reason was given for Iverson's departure from the Company. During the class period, Iverson made false and misleading statements regarding Overstock's business operations and prospects, which he knew or should have known were materially false and misleading when made.

20.     Byrne and Iverson are hereinafter referred to collectively as the "Individual Defendants."

21.     The Individual Defendants, because of their positions at Overstock, possessed the power and authority to control the Company's public statements and contents of its filings with the U.S. Securities and Exchange Commission. The Individual Defendants either uttered or authorized the publication of statements alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their position with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been

disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## RELEVANT NON-PARTY

22.    tZERO is a distributed ledger platform and cryptocurrency launched by Overstock. tZero is considered an alternative trading system (ATS), and is regulated by the Securities and Exchange Commission.

## SUBSTANTIVE ALLEGATIONS

23.    Overstock is an American internet retailer founded in 1997 and sold to Defendant Byrne in 1999. The Company initially sold exclusively surplus and returned merchandise through an online e-commerce marketplace, liquidating the inventories of at least 18 failed dot-com companies at below-wholesale prices. The company continues to sell home decor, furniture, bedding, and many other goods that are closeout merchandise; however, it now sells new merchandise as well.

24.    In May 2002, Overstock held an IPO at a per-share price of $13, and after achieving significant growth and profits in some early quarters, achieved a profit of $7.7 million in 2009 and reported its first billion-dollar year in 2010.

25.    Patrick Byrne has been the long-time CEO and Director of the Company, and during his tenure has gained a reputation as an eccentric. Unfortunately, his antics have resulted in share price volatility and investor losses. For example, the Company's share price dropped 36% in early August 2019, after Byrne claimed to have assisted the DOJ with its Russian collusion investigation and said that he was romantically involved with jailed Russian agent Maria Butina. This stock drop is illustrated in the chart below:



26.    Two weeks later, Byrne resigned from his positions with the Company, for the stated reason that he had become "too controversial" and a distraction. The company's share price rose sharply on this news, as shown above.

27.    In addition to being a man of international intrigue, Byrne considers himself to be a visionary. Most notably, in the face of Overstock's declining revenues in 2014-2015, Byrne decided to reignite growth by investing heavily in blockchain technology, which largely consists of so-called "digital ledgers" that keeps records of transactions in virtual currencies. Byrne also began to develop Overstock's own cryptocurrency unit called tZERO.

**Materially False and Misleading**
**Statements During the Class Period**

28.    After having spent 4 years and $100 million of Company assets on his blockchain initiative, Byrne announced that the tZERO was ready to launch on May 9, 2019, when Overstock filed their financial report for the first quarter of 2019 on Form 10-Q. The press release accompanying the filing stated that, "tZERO represented a "security token opportunity [that]could be in the range of tens or hundreds of billions of dollars." Expanding on that point, the release announced that:

8

Our security token capital market that we dreamed of four years ago is now ready (this month) for the public to use. Starting in a few weeks and running into September, we are rolling out our full kit of technology and apps for security token trading: a great crypto trading app, a migration of OSTKP to a token, an integration with issuance platform Securitize allowing us to bring live on tZERO tokens issued by Securitize, and DLR 2.0 (in August). In sum, starting this quarter (even this month), you will see on tZERO's platform live security tokens which (we are working with regulators to ensure) the public will be able to trade legally.

29.    The press release also included an address to the shareholders from Defendant Byrne regarding Overstock's retail operations, in which he stated:

**Retail is returning to be a source of positive cash flow rather than a consumer of it.**

Last quarter, I gave guidance that our 2019 contribution would be $160 million. I am now raising that to $165 million. G&A Expenses: Our expense management has been aggressive. We have taken a tremendous (>25%) amount of cost out of our expense structure in the last 5 months. We are lean and fit as an organization.

Taking the previous two points together**, I am raising my Retail Adjusted EBITDA guidance for 2019 from $10 million to $15 million**. I believe that by 2020, Retail positive Operating Cash Flows will be comparable with the past.

30.    In addition, the Company's 10-Q for the first quarter of 2019 attested to the effectiveness of Overstock's disclosure controls and procedures, stating:

### CONTROLS AND PROCEDURES

We maintain disclosure controls and procedures, as such term is defined in Rule 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The term disclosure controls and procedures means controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms.

**Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.**

31.    The 10-Q for Q1 2019 also contained certifications signed by Defendants Byrne and Iverson attesting to the accuracy and completeness of the Company's financial and operational reports:

## CERTIFICATION

**I, Patrick M. Byrne, certify that:**

1.  I have reviewed this Quarterly Report on Form 10-Q of Overstock.com, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors

and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

32.    Overstock common stock immediately traded higher on the rosy scenario painted by the Company's 10-Q. On May 9, 2019, shares of Overstock traded up over $2.00 per share in intra-day trading, almost 17% higher than the prior day's close. Taking advantage of this jump in the Company's share price, Byrne sold over 900,000 of his personally held Overstock shares between May 13, 2019 and May 17, 2019.

33.    The Defendants continued to champion Overstock's business prospects and the tZERO platform, publishing a press release on June 27, 2019 announcing the "launch" of the tZERO "Crypto Wallet Mobile App." According to Byrne, the "tZERO Crypto is bringing a superb wallet into production, one with distinct advantages over other wallets currently in use."

34.    Then, on July 30, 2019, Overstock issued a press release announcing Byrne's bizarre plan to pay shareholders their next dividend in the form of a cryptocurrency created by Overstock. Byrne is quoted in the press release as stating:

Five years ago, we set out to create a parallel universe: a legal, blockchain-based capital market. We've succeeded …. The approximately 40,000 holders of the currently outstanding ≈37 million shares of Overstock will be issued a dividend of ≈3.7 million of these new digital shares to trade in that new capital market.

35.    The record date for the dividend would be September 23, 2019, at which time shareholders would receive one share of cryptocurrency equivalent to Series A-1 Preferred Stock for every 10 shares

of Overstock common shares – but there were conditions involved. To receive their dividend, each investor would have to access an alternative trading system called PRO Securities that is operated by Overstock's blockchain subsidiary – tZero.

36.    In addition, the digital dividend was not registered under the Securities Act of 1933 or applicable state securities laws. Consequently, no secondary resales of such shares could occur until they become eligible for resales under Rule 144 under the Securities Act – usually about six months from the record date.

37.    Byrne portrayed this "digital dividend" as being both good for business and for the Company's investors. The investors would be rewarded for having supported his blockchain initiative and, at the same time, the digital dividend would incentivize the use of the Crypto Wallet Mobile App recently launched by tZERO"

38.    Byrne did not disclose to investors that the digital dividend was primarily intended to cause a "short squeeze," [1] and any benefit to the Company's shareholders was ancillary at best. As Byrne well knew, forcing investors to deposit 10 Overstock shares in the PRO Securities platform in order to collect their dividend and preventing secondary resales would result in the mass recall of Overstock shares that had been lent to short sellers – making it impossible for them to cover their short positions and driving up the Overstock's share price.

39.    At the same time the Defendants were touting the launch of tZERO and the issuance of a digital dividend, the Company continued to report strong performance in both their retail and blockchain segments. In a press release announcing the filing of its financial report for the second quarter of 2019,

---

[1] Byrne has long been at odds with short sellers, believing that they acted as a damper on the Company's share price. An orchestrated short squeeze is considered illegal market manipulation by the SEC.

Byrne advised the Company's shareholders that:

> Our second quarter brought strong results for both our blockchain and retail businesses as we continue to innovate in both areas with our disruptive technologies.
> * * *
> Our retail business has returned to positive adjusted EBITDA for the first time since the second quarter of 2017 and shows no signs of stopping.
>
> Finally, the recently announced shareholder dividend to be issued in shares of our Digital Voting Series A-1 Preferred Stock, OSTKO, has opened a wormhole that will further connect our retail, blockchain, and crypto universes.

40.     The same day, August 8, 2019, Defendants also filed with the SEC the Company's Q2 financial report on Form 10-Q. This filing was signed and Certified by Defendants Iverson and Byrne and contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as well as the completeness and veracity of Overstock's disclosures and reports. These representations were substantially similar or the same as those statements contained in the Company's financial report for Q1 2019, discussed *supra* at 30-31.

41.     The statements in ¶¶ 28-40 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations and prospects. Specifically, the Defendants misled investors by falsely telling them that Overstock's blockchain and retail operations were performing at or even above revised guidance, and that the future was bright for the Company's retail segment

42.     In addition, Defendants failed to advise investors that the real purpose of the digital dividend was to squeeze short sellers out of Overstock – which would create volatility in the Company's share price and increase the risk of SEC scrutiny.

43.    It was also not true that Overstock contained adequate systems of internal operational or financial controls, such that Overstock's quarterly reports filed with the SEC were not true, accurate or reliable.

### The Truth Emerges

44.    Between September 3, 2019 and September 13, 2019, Overstock's share price inexplicably skyrocketed $9.86 or 65%, closing at $24.93 on September 13th. This sudden rise in the Company's share price at first confounded analysts and investors, who could not detect any material changes in either the overall retail or blockchain markets or Overstock's business prospects.  With regards to the digital dividend, analysts believed that the structure of the dividend caused more confusion than excitement about the Company's value.

45.    The truth would come to light on September 16, 2019, when Bloomberg published an article entitled "How Patrick Byrne's Final Act at Overstock Crushed Short Sellers." This article surprised investors by disclosing that the digital dividend offering was really an engineered and well-planned short squeeze primarily designed to hurt short sellers.  As stated in the article:

> While other reasons may exist for the rally, one explanation centers on a blockchain-based "digital security" that Overstock said on July 30 it would grant to shareholders of record on Sept. 23 as a dividend. Because the security could prove hard for others to lay hands on, the potential exists for it to snarl the process by which shorts maintain positions.

> The theory behind the squeeze is technical but comes down to the obligation a short seller faces to pass dividends back to whomever lent him shares. That may prove difficult in Overstock's case because the so-called "Digital Voting Series A-1 Preferred Stock" it promised in July is unregistered, will trade only on a blockchain exchange owned by a subsidiary, and may face restrictions on transfer.

46.    Upon publication of the Bloomberg article, the Company's shares declined precipitously, falling from a close of just below $24.93 per share on September 13th (the last day of trading before the articles publication) to a close of $19.75 on September 16th – a drop of $5.18 or 20%.

47.     Shares continued to trade lower the following day, September 17, 2019, after the NY Post reported that Byrne's short squeeze was waning, as the brokerage firms JPMorgan and Morgan Stanley agreed to take cash of an equivalent value to the digital dividend to cover short positions.  According to the Post, Overstock shares "buckled as word of the brokerage concession began to spread early Friday because it meant short sellers could maintain their short positions."

48.     The publication of the NY Post article resulted in the Company's shares declining an additional $2.15 or 12% to close at $17.60 on the same days as the article's publication.

49.     On September 18, 2019, Overstock reversed course and announced in a press release that the record date for the digital dividend would be postponed. The Company also announced that it would loosen the restrictions on the dividend, stating that:

> We expect the result will be that, immediately upon distribution, such dividend shares will be freely tradable without the six-month holding period requirement under Rule 144. We are already working closely with regulators to register the shares and achieve that result.

50.     This press release failed to inform investors that the actual reason for this course change was an SEC inquiry into Byrne's orchestrated short squeeze and his effort to manipulate the market to for Overstock shares.

51.     On September 22, 2019 (a Sunday), the Company reported that Defendant Iverson had left Overstock in an unscheduled departure the prior week. The Company did not provide a reason for the departure nor why it waited nearly a week to announce the change.  In addition, the Company reported that it would lower guidance to break-even EBITDA for the year, eliminating the projected $15 million that Overstock had only recently guided investors to expect.

52.     On the next trading day, September 23, 2019, Overstock shares declined $3.78 or about 25.3% to close at $11.19, the second worst performance for the Company since it went public in 2002,

trailing only a 41.1% decline on July 18, 2008. The drop continued a horrid stretch for Overstock shares, which have fallen in seven consecutive trading sessions that add up to a decline of 58.1%, the worst seven-day stretch in Overstock history.

53.    Then, on November 12, 2019, Overstock released its financial report for the third quarter of 2019. In this filing, the Company disclosed that it received a subpoena from the SEC on October 7, 2019, requesting documents related to the so-called "digital dividend" that was announced to the Company's shareholders in June of 2019.  The subpoena requested the 10b-5-1 plans of Overstock's officers and directors, and documents relating to the Company's communications with its former chief executive officer and director, Patrick Byrne. On this news, the Company's share price slid 5% in premarket trading on November 12, 2019. The chart below illustrates wild vacillations in Overstock's historic share price throughout the class period:



**Insider Trading**

54.    Making a bad situation worse, Byrne, who had left the Company on August 22, 2019 because he had become "too controversial," would resurface in style. Just hours after the Company

announced on September 18, 2019 that it was postponing its record date for its digital dividend, Byrne announced that he had sold his entire stake in Overstock between September 16, 2019 and September 18, 2019 (the "Liquidation Period") for approximately $90 million. It soon became clear that Byrne's had been tipped off to an SEC inquiry into the digital dividend and possible market manipulation, and that the abrupt liquidation was predicated on his possession of non-public, adverse information about Overstock. In fact, he admitted it.

55.    Byrne actually bragged that he had been tipped off to the SEC investigation in a posting on his blog, DeepCapture, stating that he had contemplated liquidating his shares, but the timing of his liquidation was predicated on his inside information. In a September 18, 2019 blog post entitled "A Message to My Former Colleagues at Overstock," Byrne wrote:

> **The proximate cause of his decision to sell**, **however, came when we[2] heard over the weekend that starting last Friday, the Deep State's pets at the SEC began leaking something to their clients JPMorgan, Morgan Stanley, and Goldman (and here as citizens I bet you thought we were their clients, right? lol). They leaked that they were going to Bazoomba our digital dividend.** Once that started getting back to me, I realized this: Whenever I have had any question about whether the SEC would or would not do something totally outrageous in order to hurt our company to benefit their clients on Wall Street, they never let me down: they always did the evil thing. ...

56.    Byrne later joked about receiving non-public information regarding the SEC investigation, but incredulously claiming it had nothing to do with his decision to liquidate his holding one day before the news of the investigation went public. On September 21, 2019, Byrne tweeted:

---

[2] *See https://www.deepcapture.com/2019/09/a-message-to-my-former-colleagues-at-overstock/*



57.     The three-day average for Overstock's share price during the period of liquidation is $20.76. The closing price on the day he disclosed the SEC Investigation was $16.19 -- a difference of $4.57 per share or about 28%. Using this as a basis, a back-of-the envelope estimation is that Byrne illegally made about $25 million by selling his shares before the market realized that the SEC would investigate allegations of market manipulation.[3]

**Class Action Allegations**

58.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Overstock common stock between May 9, 2019 and September 23, 2019, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

59.     Plaint also brings this action on behalf of a Subclass of Investors who purchased shares contemporaneously with Byrne's insider trading, *i.e.*, September 16-18, 2019, inclusive (the "Insider

---

[3] A regression analysis would be needed to get a more precise figure.

Trading Plaintiffs"). Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

60.     The members of the Class and Subclass are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

61.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.     Whether the Exchange Act was violated by Defendants;

b.     Whether Defendants omitted and/or misrepresented material facts;

c.     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d.     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e.     Whether the price of the Company's stock was artificially inflated;

f.     Whether Defendant Byrne traded on non-public, material adverse information regarding Overstock; and

g.     The extent of damage sustained by Class members and Subclass members, and the appropriate measure of damages.

62.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

63. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

64. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FRAUD ON THE MARKET

65. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

    a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    b. The omissions and misrepresentations were material;

    c. The Company's common stock traded in efficient markets;

    d. The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

    e. Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

66. At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and

other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

67.     The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

68.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## LOSS CAUSATION

69.     Between May 9, 2019 and September 23, 2019, facts were revealed to the investing public regarding: (i) the weakness of the Company retail segment; (ii) the Companies inadequate internal controls and procedures; and (iii) the Defendants manipulation of the market for the Company's common stock. These facts were disclosed that were contrary to Company's public statements made beginning on May 9, 2019, as described above. These disclosures caused Overstock's stock to decline by $5.18 or 20% September 16, 2019 and $2.15 or 12% on September 17, 2019. In addition, those shareholders who purchased shares contemporaneously with Byrne's insider trading were also damaged and should receive a pro rata share of Byrnes's profit from such trading.

## CAUSES OF ACTION

### Count I
### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

70.　　Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

71.　　During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

72.　　Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

73.　　Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

### Count II
### Violation of § 20(a) of the Exchange Act
### (Against Byrne and Iverson)

74.　　Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

75.     The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the statements alleged by Plaintiffs to be false or misleading both prior to and immediately after their publication and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

**Count III**
**Violation of § 20(A) of the Exchange Act**
**(Against Byrne)**

1.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

2.     As detailed herein, Defendant Byrne was in possession of material, non-public information concerning Overstock, and traded on the basis of that information to obtain profits of approximately $25 million.

3.     Defendant Byrne's trades were made contemporaneously with the trades of Plaintiff and certain class members.

4.     Plaintiff and these Subclass members suffered damages as a result of these trades because Plaintiff and these Subclass Members did not have sufficient information regarding an SEC Inquiry and therefore bought their shares of Overstock at an unfair price.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

(b)     awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

(c)     awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

(d)     awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: November 20, 2019

_/s/ Jon V. Harper_____
Jon V. Harper (#1378)
Harper Law PLC
P.O. Box 581468
Salt Lake City, Utah 84158
(801) 910-4357
jharper@jonharperlaw.com


*Attorneys for Plaintiff*

Additional Counsel:

BLOCK & LEVITON LLP
Jeffrey C. Block, jeff@blockesq.com (*pro hac vice* motion to be filed)
Jacob A. Walker, jake@blockesq.com (*pro hac vice* motion to be filed)
Mark A. Delaney, medlaney@blockesq.com (*pro hac vice* motion to be filed)
260 Franklin Street, Suite 1860
Boston, Massachusetts 02110
(617)398-5600 phone
(617)507-6020 fax